UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 10-00726 MMM |
| Plaintiff, | ) |
| | ) |
| vs. | ) ORDER DENYING RULE 29 MOTION |
| | ) FOR ACQUITTAL AND RULE 33 |
| JOHN ALLEN WILSON, | ) MOTION FOR NEW TRIAL |
| Defendant. | ) |
| | ) |
| | ) |

On May 16, 2011, defendant John Allen Wilson was convicted, pursuant to a single count indictment, of tampering with consumer products in violation of 18 U.S.C. § 1365. At the close of the government's case in chief, on May 11, 2011, Wilson moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The court deferred ruling at that time, and Wilson renewed his motion at the close of the evidence on May 12, 2011. The court denied Wilson's motion.

Wilson now moves for a judgment of acquittal under Rule 29, or, in the alternative, for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.[1] Wilson contends that there

---

[1]Motion for Acquittal, Motion for New Trial ("Motion"), Docket No. 58 (Jul. 18, 2011).

was insufficient evidence presented at trial to convict him, and that the jury was inadequately instructed regarding the essential elements of the offense.   The government opposes Wilson's motion.[2]

# I. FACTUAL BACKGROUND

Wilson was employed by American Medical Response (AMR), a large ambulance company,[3] as a paramedic supervisor from 2006 to August 2008.[4]   AMR stored morphine and other medications in a safe located in an office next to Wilson's.   Wilson and six other supervisors had access to it.[5]   Wilson testified that, after having sustained a back injury in 2001, he was prescribed the painkiller Vicodin.  He took Vicodin for five or six years, until late 2006 or early 2007,[6] and became addicted to it.[7]   At some point, however, his doctor ceased prescribing it for him.[8]   In late September or early October 2007,[9] Wilson felt an acute need to continue using pain relieving medication and "started . . . using the expired narcotics that [AMR] had stored in [the] safe."[10] Wilson explained his decision to start using morphine from AMR's safe as follows:

> "[A]t the time I had my addiction I was dealing with.  I was having tremendous cravings.  I was drinking more than I know I should have been.  And you know, knowing the – knowing that the morphine was in there and knowing that . . .

---

[2]Opposition to Motion for Acquittal ("Opposition"), Docket No. 59 (Jul. 28, 2011).

[3]Reporter's Rough May 11, 2011 Transcript ("Rep. Tr. 5/11/11") at 134:19-20.

[4]*Id.* at 154:25-155:4, 155:15-20.

[5]*Id.* at 162:16-22.

[6]*Id.* at 155:21-156:16.

[7]*Id.* at 17-22.

[8]*Id.* at 158:7-8.

[9]*Id.* at 161:1-3.

[10]*Id.* at 158:10-11.

morphine is very – it's related to Vicodin in many ways and has the same effect, and knowing that that morphine was not going to go anywhere except to be destroyed, I started drawing it out of the vials and injecting it into my thigh."[11]

Wilson testified that he did not need to account for his use of the expired medication because

"[t]he drugs that were expired[,] . . . were in [a] Ziploc bag[ ], I believe they had a log, but they weren't really counted.  They were just in there to be destroyed. . . . They were only being safeguarded in the safe.[12] . . . Nobody really was paying much attention to the bag of expired narcotics that [was] in the safe.  And again, there wasn't really any accountability for [the drugs] because they were expired and set to be destroyed.  So essentially for the first few months, I was just taking a few vials at [a] time[,] . . . using them on myself and then just discarding the vials themselves."[13]

After a period of using the expired morphine, Wilson became "highly addicted" to the drug.[14]

In approximately April 2008, Wilson began feeding his habit by taking unexpired morphine vials from AMR's safe, because the number of expired vials was no longer sufficient to meet his needs.[15]  Wilson explained: "[I]nitially, I was seeking a way of getting more.  I mean doing everything I can, but then I started taking good narcotics that had good dates on them from the

---

[11]*Id.* at 159:15-22.

[12]*Id.* at 161:15-22.

[13]*Id.* at 162:5-11.  Wilson noted that "[w]hen the newly expired narcotics would come in, the supervisors would log them into the log sheet and they would make a notation in there that there's 400 vials of morphine that's good, and there's 30 vials that are expired.  And then what they would do is they placed those expired vials in the same safe.  Depending on what else was in there, they'd just be put on a shelf, and a lot of times it was just a simple post-it stuck inside the box saying expired.  So the medics or the supervisors would know not to grab from that pile. . . ." (*Id.* at 165:21-166:4.)

[14]*Id.* at 164:6-7.

[15]*Id.* at 164:8-18, 165:2-7.

3

safe, and I began tampering with them by extracting the narcotic out of the vials and using it."[16]
When Wilson used an unexpired vial of morphine, he extracted the contents of the vial with a syringe and replaced its contents with saline, concealing his actions as follows:

"Q: When you first began tampering with the fresh vials, would you take the fresh vial and replace it, or would you doctor the logs?

A: Well, initially I was doctoring the logs.

Q: At some point you decided to do something in addition to doctoring the log?

A: Say that one more time.

Q: At some point you decided to tamper with the actual medication. What was your thought process with respect to tampering with the medication?

A: There really wasn't much of a thought process. I was addicted and I needed the drug.

Q: Why did you extract the drug and refill it with saline solution and place it back into the safe?

A: So there would be an account for the amount of medication that was in there.

Q: Well, you testified earlier that you were taking the medication and just doctoring the logs. Why did you change from doctoring the logs to refilling a vial with saline solution?

A: It was becoming increasingly difficult to keep track of the narcotics. So I began to extract it and then put them back in the safe and kind of tuck them behind the good stuff to keep them from going out.

Q: When you say keep them from going out, what do you mean?

A: Well, I was – when I began tampering with fresh vials and then placing them back into the safe, I would put them in a position to where they were behind the good stuff, because most of the time when the supervisors would restock, they would just take right from the front. And because my office was right next door,

---

[16]*Id.* at 165:10-14.

1   I was able to keep track of those vials until I was either able to get rid of them and

2   destroy them and alter the log or a fresh order came in and I was able to just pull

3   those out and document the good stuff that's in there.

4   Q: Did you keep a constant watch as to what was going into the safe and what was

5   going out?

6   A: Yes.

7   Q: And why did do you that?

8   A: I was trying desperately to prevent it from going out into the field.[17] . . .

9   Q: Did you intend that the vial would be available for someone to take and bring

10   out to the field?

11   A: No.

12   Q: What, if anything, did you really intend?

13   A: I intended on eventually pulling those vials out and destroying them when I felt

14   it was an appropriate time so that no one would notice that there was a change and

15   no one would notice what was going on in there, in the safe itself.

16   Q: And what, if anything, did you do to ensure that those tainted vials [were] not

17   available for distribution going out into the field?

18   A: Are you talking about the safe itself?

19   Q: Yes.

20   A: I would do – what I would do is place the stuff that I knew I tampered with

21   behind the other narcotics so typically when the safe was open, someone would just

22   grab right from the front.  And at any one time, we had typically 2 to 4 hundred

23   vials of morphine in there, and usually whether a supervisor would restock, it

24   would only be maybe 10, 12 vials at a time, and they would just take right from the

25   front.

26   Q: How often would you say that you arranged, so to speak, the vials that –

27   _____

28   [17]*Id.* at 169:12-171:2.

5

A: Constantly.  I have to – let me clear that a little bit.  Constantly meaning I was in the safe assuring they were there.  But the safe was accessed pretty rarely from the supervisors because morphine and Versed really aren't used as often as people think out in the field.[18] . . .

Q: And how often would you keep a watch over the safe to make sure that those vials that you had tampered with did not make it out?

A: Almost every day."[19]

Wilson emphasized that he was "constantly . . . at fear"[20] that the morphine vials with which he had tampered would make it in the field, and into an ambulance servicing the public. Wilson testified that he ultimately decided to confess to his supervisor, Dr. Charles Dreshen, that he had been tampering with the morphine vials in the AMR safe because he "was feeling horrendous guilt and stress over the potential of medications going out into the field that had been tampered with that [he] knew were still in the safe."[21]  He stated that he "did everything in [his] power" to assure that tampered vials did not reach the public.[22]

On cross examination, Wilson testified that, despite his efforts to ensure that no tampered vials reached the public, he could not be certain that he had successfully prevented the vials from being stocked on ambulances.  He conceded he knew there was a risk that some members of the public had been, or could have been, harmed by receiving saline instead of morphine at a moment when they were in need of pain relief:

"Q: During [June and July 2008], would you [say] that you were concerned on a regular basis about the possibility of danger to the patients from this

---

[18]*Id.* at 171:17-172:18.

[19]*Id.* at 172:23-173:1.

[20]*Id.* at 176:7.

[21]*Id.* at 177:17-19.

[22]*Id.* at 178:17.

tampering. . . ?

A: I was concerned [that] the vials that I tampered with getting out to the field. . . .[23]

Q: So you were cognizant of th[e] risk that the vials would get out to the field.

A: I was cognizant of the possibility of them making it out there, and it was my belief that at that point none of them had.

Q. And so the possibility of them getting out to the field, that's what you were concerned about?  The possibility of the[m] . . . getting out into the field?

A: It was a concern of mine, yes.

Q: And why were you concerned about that?

A: I didn't want them being given to patients.

Q: And why didn't you want them being given to patients?

A: Because it wouldn't be the medication that they were supposed to get.

Q: And that would be a risk of harm to them, wouldn't it be?

A: A risk of harm?

Q: Yes, a risk of harm.

A: Could be, yes.

Q: You testified that the safe contained . . . 2 to 4 hundred [vials of morphine] is what you had said.  Would that be a range of vials that might be in the safe? . . .

A: Yes.

Q: Okay. . .  I think you also talked about how the expired vials got back into the safe from the [ambulances], that they would be brought in by the supervisors from the [ambulances] and placed in the safe?

A: Yes.

Q: And at times you said there was even just a simple yellow post-it or something put into the boxes that said expired?

---

[23]*Id.* at 185:12-16.

7

1  A: Yes.

2  Q: Okay.  So this is not what you would call a particularly airtight system, was it?

3  A: Far from it.

4  Q: And you I think also testified that a number of people were able to access that

5  safe; correct?

6  A: Correct. . . .

7  Q: Okay.  And it was close to your office. . . .  So that you could see when people,

8  or you tried to observe when people would enter that safe; correct?

9  A: Yes.

10  Q: And . . . when [other supervisors accessed the safe] you would try to go

11  checkup on the medications?

12  A: Again, it was pretty – it was pretty rare when the supervisors would go in there.

13  They'd really only go in there when they needed [to] restock, which was only an

14  average of maybe once a month the supervisors would restock.  And there's two

15  [safes].  So it wasn't often that you saw people going in there.

16  Q: And were you at the office 24 hours a day, seven days a week?

17  A: No.

18  Q: And so there's a distinct possibility that people entered the safe when you were

19  not there to observe –

20  A. There was that possibility. . . .[24]

21  Q: And so [ca] you . . . sit here and say that [tampered vials were not removed

22  from the safe] because you didn't notice it?

23  A: I'm not going to say [that] didn't [happen], but I never noticed narcotics

24  tampered with that were taken out of the safe.[25]

25  Q: [Y]ou said that during . . . essentially the whole month of August [2008], I think

26  _____

27  [24]*Id.* at 186:5-188:21.

28  [25]*Id.* at 193:11-14.

8

you even used those words, the whole month of August [you] became increasingly

and increasingly concerned that these vials were out . . . and that's when [you]

finally broke down and told Dr. Drehsen.

A: That was a big part of it, yes.[26] . . .

Q: As you sit here today, can you tell us whether a patient, any patient in Ventura

[C]ounty received any of your tampered vials?

A: I do not believe they did.

Q: But you cannot tell us certainly, [can] you?

A: I can only go off any reports that were made, but I do not believe they did.  Can

I tell you with any certainty?  No."[27]

The court also heard testimony from Wilson's supervisor at AMR, Medical Director Dr.

Charles Dreshen.[28]  Dreshen testified that Wilson "had access to all the ambulance . . . supplies

and all the different areas of Ventura county, plus his own ambulance.  He drove a supervisor's

vehicle that had drugs in it."[29]  When Wilson called Dreshen to confess that he had tampered with

morphine vials in AMR's safe, Dreshen testified that he "asked [Wilson] if there was any of the

morphine . . . that [AMR] had access to in the county that was potentially unscathed or

untouched."[30]  The questioning continued:

"Q: And what did he say?

A: And at that point he told me not really.

Q: And what did you take that to mean?

A: That meant that the ambulances could have substances other than the drugs that

---

[26]*Id.* at 196:23-197:24.

[27]*Id.* at 198:15-21.

[28]Reporter's Rough May 10, 2011 Transcript ("Rep. Tr. 5/10/11"), 145:17-22.

[29]*Id.* at 152:23-153:1.

[30]*Id.* at 154:2-4.

were supposed to be in the vials and . . .OK I asked him specifically about the safe, and he told me that even the sealed boxes [were potentially tainted].  He was very forthright about it.[31] . . .

Q: Did he tell you that the – that all of the medication that [was] out on the ambulances were tainted?

A: Yes.  Could be.

Q: Potentially tainted?

A: Yes.[32] . . .

Q: Were you concerned that there [might] be ambulances going out into the field to treat patients that might have those tampered vials in them?

A: Yes.

Q: Did the defendant assure you that he knew that the vials were not in those rigs?

A: No.”[33]

The government also proffered the testimony of Brian Richmond, a Homicide Detective with the Ventura County Sheriff's Department.[34]  In August 2008, Richmond interviewed Wilson and recorded the interview with Wilson's consent.[35]  Richmond reported that Wilson expressed uncertainty as to whether the tampered vials had reached the public:

“Q: Could the defendant – did the defendant give you any indication of where the specific vials were that he may have tampered with?

A: They were – could be on . . . the ambulances or in the safe where he found them.

---

[31]*Id.* at 154:5-11.

[32]*Id.* at 155:17-21.

[33]Rep. Tr. 5/11/11 at 14:3-9.

[34]*Id.* at 74:14-20.

[35]*Id.* at 75:11-22.

Q: And could he tell you precisely which vials were where at that point?

A: No.

Q: Was it your impression from what he was saying that there was a possibility in his mind that those tampered vials could be administered to actual patients?

A: Yes, correct."[36]

The tape recording of Richmond's interview with Wilson reflects Wilson's concern that tainted vials may have reached the public. Wilson stated: "It's been probably 34 days that I've not been using [morphine], but ever since then, I've been feeling so guilty about there being vials out there that have saline in them that are potentially being given to patients. . . ."[37] He also stated that he was "[f]eeling very bad that there's medication out there that isn't what it [says it] is."[38] Wilson went so far as to say that he believed a handful of tainted vials had, in all likelihood, been distributed to patients:

"Q: What did you do with the vials that had the saline in it?

A: Some of those were distributed out to the ambulances, that is why I finally went to Dreshen yesterday and wanted those vials brought back in and gotten – or given to [law enforcement], or whatever, I did not want them going to patients. I can't tell you that – whether they did or didn't. I probably think maybe a couple of patients got some saline. I'm hoping in my heart of hearts that I got them before they went out in large amounts."[39]

The government also called Charles Teddington who, in September 2008, was the Supervising Investigator for the California State Emergency Medical Services Authority

---

[36]*Id.* at 79:23-80:9.

[37]Government's Exhibit No. 49 (Audio Tape Recording of John Allen Wilson's Interview with Detective Richmond) at 3:01-28.

[38]*Id.* at 4:38-47.

[39]*Id.* at 14:00-15:04.

(EMSA).[40]   Teddington testified that the EMSA is responsible, in part, for investigating paramedics when there has been an allegation or complaint of misconduct.[41]  In September 2008, after he received a telephone call from Dreshen, Teddington opened an investigation of Wilson.[42]  Dreshen told Teddington that Wilson "was engaged in diverting controlled medications, [i.e.,] Versed[ and] morphine."[43]  A a few days after opening the investigation, Teddington spoke with Wilson via telephone.[44]

Teddington testified that Wilson "shared with [him the fact] that he applied heat to the cap [of the vials].  He inverted the cap and applied heat so that the injection port entry mark or hole . . . would close up and would not be visibly noticeable or detectable."[45]  Wilson described the progress of his addiction, and his tampering with AMR morphine vials, as follows:

> "Our initial conversation, as I recall in our initial conversation, the defendant shared with me that he initially was using expired medications, expired in that it was his responsibility to destroy any controlled substances as we spoke about.  And it was then that he stated that he began to use those expired medications; however, there is a narcotics control log.  I'm going to call it that, but there was a log that he had to [update] with regard to those destroyed narcotics.  The defendant state[d] to me that some of those narcotics he used for his personal use and some he destroyed; however, he did state that he doctored the logs so that it would appear that he had destroyed all of the narcotics.[46] . . . [W]hat the defendant told me was that he had

---

[40]Rep. Tr. 5/11/11 at 130:20-131:2, 131:14-21.

[41]*Id.* at 131:3-8.

[42]*Id.* at 131:13-21.

[43]*Id.* at 133:12-14.

[44]*Id.* at 134:6-13.

[45]*Id.* at 138:7-11.

[46]*Id.* at 138:15-139:2.

access to those pharmaceutical stock[s] where the company stored the vehicles – I mean the company stored the pharmaceutical stock as well as the supervisors' vehicles where that stock would be given to paramedics, was my understanding, as well as his own vehicle.[47] . . . I recall asking him was he aware whether or not the vials he diverted and placed saline solution in ever reached the public. . . . He said he didn't know.  He said I don't know.  He said I hope not, but I don't know."[48]

The government adduced no evidence affirmatively indicating that tampered vials were distributed to the public.  Vials from Wilson's vehicle were tested, and were found to be tainted; Wilson admitted to tampering with the vials in his own vehicle, however, and no vials from other vehicles were tested.[49]

## II.  DISCUSSION

### A.  Legal Standard Governing Judgment of Acquittal Under Rule 29

Under Rule 29 of the Federal Rules of Criminal Procedure, the court must order the entry of a judgment of acquittal "if the evidence is insufficient to sustain a conviction." FED.R.CRIM.PROC. 29(a); *United States v. Tisor*, 96 F.3d 370, 379 n. 6 (9th Cir. 1996); *United States v. Affinito*, 873 F.2d 1261, 1264 (9th Cir. 1989).  Motions for judgment of acquittal made after the return of a guilty verdict must be made within seven days or "within any other time the court sets during the 7-day period."  FED.R.CRIM.PROC. 29(a); *United States v. Navarro Viayra*, 365 F.3d 790, 792 (9th Cir. 2004).  Here, the court extended the seven day period immediately following the jury's return of a verdict, and defendant filed within the extended time set by the court.

Entry of a judgment of acquittal is proper only if the court concludes, after viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences in

---

[47]*Id.* at 142:9-14.

[48]*Id.* at 143:8-13.

[49]*Id.* at 70:12-71:22.

13

the government's favor, that no reasonable juror could find the defendant guilty of the crime charged beyond a reasonable doubt. *United States v. Leos-Maldonado*, 302 F.3d 1061, 1063 (9th Cir. 2002) ("'[T]his court must review the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" quoting *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000)); *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) ("[A] district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"); *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998) ("A motion for a judgment of acquittal challenges the sufficiency of the evidence to convict. . . . We review the denial of this motion *de novo*. In doing so, we consider the evidence, all reasonable inferences drawn from it and all credibility determinations in the light most favorable to the Government, and affirm if a reasonable jury could find the offense's essential elements beyond a reasonable doubt"); *United States v. Cunningham*, 108 F.3d 120, 123 (7th Cir. 1997) ("'We review the evidence and all reasonable inferences in the light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt,'" quoting *United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir. 1994)).

## 1. Adequacy of Government's Evidence

Wilson argues that, based on the facts presented at trial, a reasonable jury could not rationally have concluded that he was guilty of tampering with consumer products.[50]  This is so, Wilson contends, because the government adduced insufficient evidence that he had the requisite mental state under the law.  The parties agreed to the following instructions regarding the elements of the offense and the necessary *mens rea*:

"Defendant is charged with tampering with a consumer product with reckless

---

[50]Motion at 6.

14

disregard for the risk that another person will be placed in danger of bodily injury, in violation of Title 18, United States Code Section 1365(a).  In order for defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

> 1.   Defendant tampered with, or attempted to tamper with, a consumer product, its labeling, or its container;
>
> 2.  The consumer product affected interstate or foreign commerce; and
>
> 3.  Defendant acted with reckless disregard for the risk that another person would be placed in danger of death or bodily injury; and
>
> 4.   Defendant acted under circumstances manifesting extreme indifference to such risk. . . .

The phrase 'reckless disregard' means that defendant disregarded a risk of harm of which he was consciously aware.  A person is consciously aware of a risk if he deliberately closed his eyes to what would otherwise have been obvious to him.

The term 'indifference' means lack of interest, enthusiasm, or concern.  The phrase 'extreme indifference to such risk' requires conscious or deliberate indifference to the risk that another person will be placed in danger of bodily injury. This indifference is not mere carelessness.  In deciding whether defendant acted with extreme indifference to the risk that another person would be placed in danger of bodily injury, you should consider the totality of defendant's conduct, behavior and actions."[51]

Wilson argues that he

"gave a thorough and credible account of his addiction, his theft of the drugs, and

---

[51]Jury Instructions, Docket No. 42 (May 10, 2011) at 16 (Instruction No. 13); 21 (Instruction No. 18).

the methods he used to cover it up.  The methods he used to cover up the theft were varied and thoughtful of the risk of death or bodily injury.  He was constantly concerned of the risk of tainted vials leaving AMR's safe. Persistent cross examination by the government failed to show that Mr. Wilson was not truthful with respect to the method he employed to insure that tainted vials did not leave AMR's safe.  The efforts employed by Mr. Wilson demonstrates a lack of a reckless disregard for the risk of death or bodily injury."[52]

Wilson contends that, because his efforts to ensure that tainted vials did not reach the public demonstrate that he did not recklessly disregard the risk of death or bodily injury, the government failed to prove beyond a reasonable doubt that he acted with reckless disregard for the risk of death or bodily injury, and under circumstances manifesting an extreme indifference to such risk.[53] Accordingly, Wilson contends, a judgment of acquittal is proper.[54]

The court must thus consider whether the evidence the government adduced of Wilson's mental state was sufficient to permit a rational jury to conclude that he acted with reckless disregard for the risk that another person would be placed in danger of death or bodily injury and under circumstances manifesting extreme indifference to that risk.  The court notes first that, although Wilson asserts that his testimony regarding the measures he took to ensure that tainted vials did not reach ambulances was "thorough and credible," the jury was free to reach a contrary conclusion. The court cannot second guess jurors' credibility determinations at this stage.  Indeed, "[i]n reviewing testimony for [purposes of] determining a Rule 29 motion, questions [as to] the weight of the evidence or . . . the credibility of the witnesses are foreclosed by the jury's verdict."  *United States v. Cohen*, 455 F.Supp. 843, 852 (E.D. Pa. 1978); see also *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) ("It is settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable

---

[52]Motion at 6.

[53]*Id.* at 7.

[54]*Id.*

inferences to be drawn for that of the jury,'" quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)); *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004) ("Carter's attacks on the evidence in his brief are not directly aimed at any evidentiary deficiency, but at the credibility of the witnesses. 'It is well settled in this Circuit that attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.' . . . 'It is equally clear that issues of witness credibility are for the jury,'" quoting *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993)); *United States v. Villarman-Oviedo*, 325 F.3d 1, 15 (1st Cir. 2003) ("All credibility determinations are left for resolution by the jury for Crim. Rule 29 purposes"); *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) ("Notably, it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion"). Accordingly, to the extent that Wilson predicates his Rule 29 motion on an adverse credibility determination by the jury, his motion fails.

Additionally, while Wilson testified that he made efforts to ensure that no tampered vials reached the public, he also testified that he was not certain his efforts were successful. Numerous witnesses – including Dreshen, Richmond, and Teddington – confirmed that Wilson admitted to them in August 2008 that he was extremely concerned and anxious that tainted vials had reached, or might reach, the public. While Wilson apparently made considerable efforts to control the flow of morphine from AMR's safe – by monitoring supervisors' activities in and around the safe, and by attempting to ensure, to the best of his ability, that new vials with which he had not tampered were at the front of the safe – the area from which he presumed most supervisors would take vials to restock their ambulances – he also testified that he was not at work twenty-four hours a day and could not be certain that he had monitored all drugs being put into and taken out of the safe. Wilson testified that there were between two and four hundred vials in the safe at any given time; this alone indicates the difficulty in monitoring the movement of the vials. Recognizing this, Wilson testified that he believed no tainted vials had reached the public, but that he could not be certain this was the case. As a consequence, he chose to confess his misdeeds to Dreshen because he was concerned that a tainted vial might reach the public. When Wilson spoke with Dreshen, he said he could not confirm with certainty that there were any vials either in the safe or in the

ambulances that were free of tampering.

Given Wilson's admissions that he could not be certain that tampered vials would not reach the public, and that he tampered with vials for a period of more than four months despite knowledge of the potential risk of harm to the public, a rational jury could have concluded that Wilson possessed the requisite mental state for conviction.  See *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1328 (9th Cir. 1992) (affirming the district court's denial of the defendant's Rule 29 motion for acquittal where "[t]he sole issue to be decided by the jury was thus whether defendant possessed the requisite state of mind to commit the crimes charged," because "[b]ased on the evidence presented, a rational juror could have inferred that appellant must have known that he was transporting illegal aliens, or at least acted in reckless disregard of that fact"); *id.* (opining that "the jury was not required to accept his exculpatory testimony, even if it was not directly rebutted by the government").

Although the evidence would perhaps have permitted a rational jury to reach a contrary conclusion regarding Wilson's mental state, the evidence adduced by the government "need not unequivocally point to the defendant's guilt [so] long as it permits the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir.1990), cert. denied, 500 U.S. 915 (1991).  "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt," may a verdict be overturned.  *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989), cert. denied, 493 U.S. 1087 (1990).  Wilson has not met this exacting standard.  See *United States v. Moyer*, 182 F.3d 1018, 1022 (8th Cir. 1999) (denying defendant's Rule 29 motion where "Dr. Moyer also contends that the evidence at trial was insufficient to support the jury's finding that she acted 'with reckless disregard,' see 18 U.S.C. § 1365(a).  On the contrary, we think that there is ample evidence in the record to support the jury's finding that Dr. Moyer acted with reckless disregard of the serious health risks to which her actions exposed her critically ill patients.  Expert witnesses testified that Dr. Moyer's actions created risks for her patients of increased pain, agitation, infection, and air embolism.  Dr. Moyer herself testified at trial that she *was aware* at the time of the tamperings that her actions might be creating health risks for her patients"

1   (emphasis added)).   For these reasons, Wilson's Rule 29 motion for judgment of acquittal is

2   denied.

3        **B.     Standard Governing Motions for New Trial**

4        When a criminal defendant seeks a new trial pursuant to Rule 33 of the Federal Rules of

5   Criminal Procedure, the court must determine whether "the evidence preponderates sufficiently

6   heavily against the verdict that a serious miscarriage of justice may have occurred." *United States*

7   *v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313,

8   1319 (8th Cir. 1980)).[55]   This is a different standard than that applied in ruling on a Rule 29

9   motion, as the court "'need not view the evidence in the light most favorable to the verdict; it may

10  weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *Id.* (quoting

11  *Lincoln*, 630 F.2d at 1319).   As a result, the court's power to grant a new trial is broader than its

12  power to grant a motion for judgment of acquittal.   *Id.*   Despite this fact, a motion for new trial

13  based on the weight of the evidence should be granted only in "exceptional cases." *United States*

14  *v. Capati*, 980 F.Supp. 1114, 1132 (S.D. Cal. 1997) (citing *United States v. Pimentel*, 654 F.2d

15  538, 545 (9th Cir. 1981)).   See also *United States v. Merriweather*, 777 F.2d 503, 507 (9th Cir.

16  1985) (a motion for new trial should be granted "in an exceptional case in which the evidence

17  weighs heavily against the verdict").

18        **1.     Whether the Jury Was Adequately Instructed**

19        Wilson contends that the court should order a new trial because the jury was inadequately

20  instructed on the essential elements of the offense charged.[56]   Wilson asserts that, while the parties

21  submitted a joint jury instruction – Instruction No. 18[57] – regarding "reckless disregard" and

22

---

23        [55]The court distinguished this standard from that which governs decision of a motion for

24  judgment of acquittal under Rule 29.   As noted, when presented with a motion under Rule 29, the
    court must determine whether, viewing the evidence in the light most favorable to the government,

25  a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Alston*,

26  974 F.2d at 1210.

27        [56]Motion at 7-8.

28        [57]The court quoted the full text of Instruction No. 18, *supra*, at 4.

"extreme indifference," "[i]n hindsight, the parties could have been a bit more thorough in crafting an appropriate instruction."[58]  Wilson notes that the jury sent a note requesting clarification of Instruction No. 18,[59] and that the court declined to provide clarification.[60]

In reviewing instructions for error, the court must ask whether, "taken as a whole, they misle[d] the jury or state[d] the law incorrectly to the prejudice of the objecting party."  *City of Long Beach v. Standard Oil of California*, 46 F.3d 929, 933 (9th Cir. 1995) (quoting *Reed v. Hoy*, 909 F.2d 324, 326 (9th Cir. 1989)); see also *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law").  It is proper to vacate a conviction "only . . . if, 'viewing as a whole the charge actually given, [defendant] was prejudiced.'"  *United Staets v. Bell*, 584 F.3d 478, 484 (2d Cir. 2009) (quoting *United States v. Dove*, 916 F.2d 41, 45 (2d Cir. 1990) (internal quotation marks omitted)).

As support for requested Instruction No. 18, both Wilson and the government cited *United States v. Gonsalves*, 435 F.3d 64 (1st Cir. 2006).  There, the court considered the *mens rea* necessary to satisfy the "recklessness" element of 18 U.S.C. § 1365(a).  The court opined that "[o]bjectively reckless behavior is often strong evidence of conscious indifference, which certainly does not require admissions as to the defendant's subjective state of mind or other 'direct' proof.

---

[58]Motion at 8.

[59]See *id.*, Exh. B (Jury note stating "Clarification of Instruction 18[:] Would disregard be 'reckless' if a person took some steps or actions to mitigate potential harm or the amount of risk[?]").

[60]See *id.*, Exh. C (Court's response stating: "The government must prove beyond a reasonable doubt the following elements: (1) Defendant tampered with, or attempted to tamper with, a consumer product, its labeling, or its container; (2) The consumer product affected interstate or foreign commerce; (3) Defendant acted with reckless disregard for the risk that another person would be placed in danger of death or bodily injury; and (4) Defendant acted under circumstances manifesting extreme indifference to such risk.  The instructions define reckless disregard and extreme indifference.  *The question you have posed is a factual issue that you must decide by weighing all the evidence and applying the court's instructions to that evidence*.  I remind you that you must follow all of the court's instructions and not single out some and ignore others; they are all equally important" (emphasis added)).

But conceivably, in some situations, one could be grossly careless in an objective sense without having a subjective awareness of or indifference to the risk being created. Accidents with rotating high-speed table saws provide more than a few examples of this situation." *Id.* at 70. The court therefore concluded that "the better reading of the statute is that conscious or deliberate indifference to risk is required for conviction. This reading is supported by the statute's related reference to a requirement of 'circumstances manifesting extreme indifference to such risk,' and by clear-cut language in the committee report: 'Because the possible penalty is so severe, the Committee believes that liability should be limited to those circumstances where the defendant consciously disregards a grave risk of serious danger to other persons.'" *Id.*

With these principles in mind, the court approved the following instruction:

"The phrase 'reckless disregard' as used in these instructions, means that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond a reasonable doubt of an intent of the defendant to avoid knowledge or enlightenment would permit the jury to infer knowledge. . . ."

*Id.*

The *Gonsalves* court commented that "Gonsalves *got* instructions that gave him the equivalent of what we think Congress had in mind, namely, that indifference to risk (connoting a state of mind) – and not mere carelessness (objectively reckoned) – was the minimum *mens rea* required. In addition to quoting the statutory requirement of 'indifference to such risk,' the court defined 'reckless disregard,' which is the more ambiguous of the two key phrases, in language sufficient to convey the idea of conscious disregard. . . . This instruction is not the only way to convey the thought – explaining subjective recklessness is not easy – but it was sufficient." *Id.*

In light of this case law, the court concludes that the jury was not improperly instructed. Like the jury in *Gonsalves*, the jury here was expressly instructed that mere carelessness was insufficient to support conviction. It was also expressly instructed on the meaning of "extreme indifference." Wilson did not object to Instruction No. 18 during trial. Indeed, as noted, he proposed the instruction jointly with the government. Nor has he proffered an alternate

1  formulation that he asserts would have been more appropriate and that is supported by the case law.

2  Thus, the court cannot conclude that "taken as a whole, [its instructions] misle[d] the jury or

3  state[d] the law incorrectly."  *Standard Oil of California*, 46 F.3d at 933.

4       Wilson's Rule 33 motion for new trial based on Instruction No. 18 must therefore be denied.

5       **2.**     **Whether the Court Should Grant A New Trial In the Interests of Justice**

6       Wilson argues finally that the court should order a new trial in the interests of justice,

7  because the evidence "preponderates heavily against the verdict."[61]  *United States v. Pimentel*, 654

8  F.2d 538, 545 (9th Cir. 1981).  This is so, Wilson asserts, because "the government's entire case

9  rested on circumstantial evidence of [his] mental state which [did] not establish beyond a reasonable

10  doubt that [he] acted with reckless disregard for the risk of death or bodily injury and under

11  circumstances manifesting extreme indifference to that risk."[62]

12       Wilson's argument is unpersuasive.  As discussed *supra*, while Wilson testified that he took

13  measures to ensure that the tainted vials did not reach the public, he also admitted that he was not

14  able to guarantee that his efforts were successful.  Wilson admitted repeatedly, in August 2008,

15  and during direct and cross examination at trial, that the risk that tainted vials AMR ambulances

16  would distribute tainted vials caused him considerable stress and anxiety, and that he could not be

17  certain that it had not occurred.  Wilson's testimony in this regard was credible.  Based on this

18  testimony, a reasonable jury could have concluded, without a miscarriage of justice, that Wilson

19  possessed the requisite mental state, as he had a clear awareness of the risks his conduct posed but

20  persisted in engaging in it..

21       Consequently, this case is not such an "exceptional case[ ]" as to warrant a new trial.

22  *Capati*, 980 F.Supp. at 1132.  See also *United States v. Wright*, 634 F.3d 770, 778 (5th Cir. 2011)

23  ("Nor did the district court abuse its discretion in denying Wright's motion for a new trial pursuant

24  to Rule 33.  The district court correctly instructed the jury. . . .  Furthermore . . . [t]here would

25  not be a miscarriage of justice for the verdict to stand because the weight of the evidence does not

26  _____

27  [61]Motion at 8.

28  [62]*Id.* at 9.

22

preponderate against the verdict"); *Joyce v. United States*, 373 Fed. Appx. 172, 178-79 (3d Cir. Apr. 6, 2010) (Unpub. Disp.) ("Joyce attacks the weight of the evidence proving his specific intent to defraud Erie, a required element [of the charged offense]. . . .  We agree with the District Court's finding that a rational juror could believe Buehler's testimony, conclude that Joyce could not sincerely believe he was suffering from severe injuries in light of his activities, and further conclude that Joyce had knowingly made material misstatements of fact to Erie.  The jury could infer from Joyce's numerous exaggerations and misstatements a specific intent to defraud Erie.  Given the weight of the evidence, there is no support for the view that the jury convicted an innocent man.  Joyce does not meet his high burden here of showing that a new trial was warranted.  Accordingly, we hold that the District Court did not abuse its discretion in denying Joyce's motion for a new trial").

### III.  CONCLUSION

For the reasons stated, Wilson's motion for acquittal and his motion for a new trial are denied.


DATED: August 29, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

23